CRAWLEY, Judge.
In February 1994, Thomas Jarzen and David Harvey sued Northwestern Mutual Life Insurance Company (“NMLI”) and Jack Wright, seeking damages based on allegations of misrepresentation, suppression of material facts, and conspiracy. NMLI and Wright filed motions for summary judgment, asserting that the plaintiffs’ claims were barred by the two-year statute of limitations set forth in Ala.Code 1975, § 6-2-38. The trial court entered a summary judgment for the defendants. Jarzen and Harvey appealed to the Supreme Court, which transferred the ease to this court pursuant to Ala.Code 1975, § 12-2-7(6).
The sole issue for our review is whether the trial court correctly concluded that Jar-zen and Harvey’s claims against NMLI were barred by the statute of limitations. We affirm.
“The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law.” Howard v. Mutual Savings *1088 Life Insurance Co., 608 So.2d 879, 381 (Ala.1992). We must review the record in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Id. The nonmovant must meet his burden by presenting “substantial evidence.” Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. “Under the substantial evidence test, the nonmovant must present ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’” Howard, 608 So.2d at 381 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
Fraud actions are governed by a two-year statute of limitations under Alabama law. See Ala.Code 1975, § 6-2-38. The question of when a party discovered or should have discovered fraud is normally a question for the jury; however, the question may be decided as a matter of law in cases where the plaintiff knew of facts that would have placed a reasonable person on notice of fraud. Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458 (Ala.1991). Our supreme court has further stated:
“[I]t is the knowledge of such facts that would have alerted a reasonable person to the existence of a potential fraud, and not actual knowledge of the fraud itself, that determines whether the question of the tolling of the limitations period in a fraud case can be decided as a matter of law.”
McGowan v. Chrysler Corp., 631 So.2d 842, 845 (Ala.1993) (emphasis in original). These facts may be discovered as a matter of law when the plaintiff receives documents that would put a reasonable person on notice of the fraud. Fabré v. State Farm Mutual Automobile Insurance Co., 624 So.2d 167, 169 (Ala.1993); Kelly v. Connecticut Mutual Life Insurance Co., 628 So.2d 454 (Ala.1993). Documents that are vague or that do not reasonably indicate that a fraud has occurred, however, will not “warrant a finding that the fraud claim is barred as a matter of law.” Kelly, 628 So.2d at 458 (citations omitted) (emphasis in original).
The record reveals that in 1981, Jar-zen and Harvey’s employer, the Calhoun-Clebume Mental Health Board (“Board”) purchased an NMLI whole life policy for Jarzen and Harvey as a part of a deferred compensation package. Harvey has a master’s degree in social work and has been employed as executive director of the Board for 23 years. Jarzen has a bachelor’s degree in financial management. Jarzen has been employed as assistant executive director of the Board for 20 years and in that capacity he is responsible for the Board’s personnel, budgeting, general operations, and administration.
In 1981, the Board employed a lawyer with expertise in financial planning, retirement packages, and fringe benefit packages, to make a presentation regarding a fringe benefit package for the executive staff of the Board, namely Jarzen and Harvey. One of the items the lawyer recommended was a “split dollar” insurance policy. Relying on the lawyer’s advice, the Board purchased whole life policies from NMLI for Harvey and Jarzen as part of their deferred compensation packages and as a tax planning benefit to them. Although Jarzen and Harvey were designated as the owners of the policies, the Board paid the first four annual premiums on both of the policies. Allen Roberts, a former agent under contract with Wright, a general agent for NMLI, handled negotiations with the Board.
Jarzen and Harvey filed their complaint in 1994, alleging that two misrepresentations were made to them at the time the insurance policies were sold: (1) that after four years the premiums could be paid with the dividends and cash value increases of the policies (i.e., that the policies would pay for themselves); and (2) that Jarzen and Harvey could borrow money from the policies at eight percent interest without penalties or harm to the policies. Jarzen and Harvey assert that, based on those representations, each of them borrowed $8,000 to $10,000 from their policy and the Board ceased paying premiums and instead paid an amount equal to the premiums directly into Jarzen and Harvey’s deferred compensation plans.
*1089 A review of the testimony and the documentary evidence indicates that Jarzen and Harvey knew as early as 1985 and no later than 1988 that premiums must be paid for more than four years and that loans adversely affected the performance of the policies. Jarzen and Harvey both admitted that after they borrowed the money from the policies in 1985, they immediately realized that “maybe [they had] screwed up,” because, as a result of the loans, the policies would not carry themselves as originally planned. Jarzen and Harvey also conceded that several years before they instituted this action against NMLI, NMLI told them that when they borrowed from the cash value of the policies the original status of the policies changed. After they borrowed the money from the policies, Jarzen and Harvey began a series of correspondence with NMLI in which they inquired about the status of their policies.
In March 1986, in responding to an inquiry by Harvey, NMLI stated that there were certain policy transactions that would affect the value available to support the premium loan. Later in March, Harvey sent a $600 payment to NMLI. This payment was made after the four-year period of payments had expired. In May 1986, Harvey stated in a letter to NMLI that if NMLI was not applying the cash value increase and the dividend each year against the premium, plus interest owed on the loan, then he and Jarzen had been seriously “misled.” Later, Harvey received notices from NMLI regarding premium payments which were due.
In March 1988, Harvey wrote to NMLI stating that one of NMLI’s representatives had indicated to Harvey that he had no cash value remaining in his policy. NMLI responded by stating that Harvey’s policy had a cash value of $18,056, but that there was a policy loan and a premium loan which to-talled a $18,136.04 indebtedness. Thus, the loan indebtedness exceeded his cash value and made his net cash value negative. NMLI informed Harvey that having a negative cash value will eventually terminate his insurance. Harvey later admitted that a payment was necessary to maintain his policy. NMLI notified Harvey that more payments would be needed to maintain his policy for another year (to 1989). NMLI stated in the notice that the reason the additional money was needed was because Harvey’s policy indebtedness exceeded his policy cash value since premium and loan payments had not been paid when due.
In May 1988, Jarzen wrote to the Alabama State Department of Insurance. Jarzen’s letter stated: “We get the feeling that [NMLI] regrets writing the minimum deposit whole life type policy years ago and is attempting to get us to drop this policy and substitute another or [is] attempting to keep fresh cash coming in on the policy.” In June, NMLI responded to Jarzen’s inquiry to the Alabama Insurance Department by addressing the representations made in 1981 at the time the policies were sold. NMLI stated that the projections of future minimum payment plans were discussed and provided for illustration purposes only and were not a guarantee of future results. Moreover, Jar-zen and Harvey both received annual policy statements and annual bills from NMLI which detañed the status of their policies.
Jarzen and Harvey’s deposition testimony also reveals that they knew of facts that would put a reasonable person on notice of fraud. Jarzen testified that he knew the alleged misrepresentations were wrong:
“Q. [In] 1987 you knew that additional premium payments from you out of pocket would be required, is that correct?
“A. Yes.
[[Image here]]
“Q. In 1988 you wrote a letter to the insurance commissioner, did you not?
“A. Yes.
[[Image here]]
“Q. Now I want to draw your attention to paragraph 3 and ask you to read that for the record, please.
“A. [Reading:] We get the feeling that Northwestern regrets writing the minimum deposit whole life type policy years ago and is attempting to get us to drop this policy and substitute another or are attempting to keep fresh cash coming in on the policy.’
*1090 “Q. Were there any particular statements made to you that drew you to this conclusion?
[[Image here]]
“A. Because we were at the meeting in Birmingham, shown all the other things we could do to get rid of this policy and get to another one, was one reason.
“Q. Anything else?
“A. And then we had to keep sending money every year to keep it in force.
[[Image here]]
“A. Well, the answer that the insurance commission got implied that it was our fault, we screwed it up.
“Q. What about the answer to the insurance commissioner would lead you [to] believe that it was your fault?
“A. I believe in there it was that if we hadn’t borrowed money; by doing so, we changed the policy.”
Jarzen also stated that in 1988 he understood that the reason premiums were still due on the policies was because the borrowed money caused interest accumulation. Otherwise, he understood, the policies would have paid for themselves after the fourth year.
Harvey’s testimony also indicates his knowledge that the alleged misrepresentations were wrong:
“Q. Did anyone ever explain to you that if you borrowed against the policy that the dividend interest rate would be less?
“A. ... It did come out later on, ’86 or ’87....
“A. If I could clarify this, ... after year four [1985], we borrow the money out. This is when the confusion began to come out and we accepted the fact that maybe we screwed up.... This — after year four, that’s when I bec[a]me aware of the fact, in fact 1985, that when we borrowed money out, that is was — we were told and made to believe that we had made a mistake, and therefore the premiums will go on and I’ll have to come up with new cash. So the confusion happened after 1985 when we borrowed the money.
[[Image here]]
“Q. Well, let’s back up and phrase it this way. Were you told anything by anyone from Northwestern about why the policies weren’t performing the way you had originally understood that they would perform?
“A. I was told—
“[Objection.]
“Q. Or originally told they would perform?
“A. I was told that later on, at least in ’85, ’86, in that range, that because you — when you borrowed it, it changed the whole status of the policy.”
Thus, the record evidence makes it undis-putable that Jarzen and Harvey knew, no later than 1988, six years before they sued, that the premiums must be paid for more than four years and that policy loans adversely affect policy performance. Therefore, the trial court correctly concluded that, as a matter of law, Jarzen and Harvey’s complaint was barred by the statute of limitations. The documents put Jarzen and Harvey on notice of facts that would indicate that a fraud had occurred. See Kelly v. Connecticut Mutual Life Insurance Co., 628 So.2d 454 (Ala.1993). Accordingly, Jarzen and Harvey’s claims are barred as a matter of law.
The judgment of the trial court is affirmed.
AFFIRMED.
YATES and MONROE, JJ., concur.
ROBERTSON, P.J., dissents.
THIGPEN, J., recuses.